UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

HORIA DRAGHICIU,                          )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )        No. 1:23-cv-02125-SEB-TAB
                                          )
REID HOSPITAL & HEALTH CARE               )
SERVICES, INC.                            )
   d/b/a REID HEALTH,                      )
REID PHYSICIAN ASSOCIATES, INC.,          )
                                          )
                    Defendants.           )

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Horia Draghiciu, M.D. ("Dr. Draghiciu") filed this lawsuit against his for-
mer employers, Defendants Reid Hospital & Health Care Services, Inc. d/b/a Reid Health
("Reid Health") and Reid Physician Associates, Inc. ("RHPA") (collectively, "Defend-
ants"), for unlawful discrimination on the basis of age, in violation of the Age Discrimina-
tion in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq*., as well as for breach
of contract. Now before the Court is Defendants' Motion for Summary Judgment. Dkt. 62.
For the reasons detailed below, that motion is **GRANTED**.

**LEGAL STANDARD**

Summary judgment is proper when "the movant shows that there is no genuine dis-
pute as to any material fact and that the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a). Because summary judgment requires "no *genuine* issue of *material*
fact," "the mere existence of *some* alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247−48 (1986) (emphasis in original). Material facts are those that "might affect the outcome of the suit," and a dispute of material fact is genuine when "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

As the "put up or shut up" moment in a litigation, summary judgment requires parties to "show what evidence [they] ha[ve] that would convince the trier of fact" to find in their favor on any disputed elements. *Olendzki v. Rossi*, 765 F.3d 742, 749 (7th Cir. 2014). Because summary judgment is not "a vehicle for resolving factual disputes," the district court need not "sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Indeed, those tasks belong to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). "The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge*, 24 F.3d at 920 (citing *Anderson,* 477 U.S. at 249–50). When deciding whether a genuine dispute of material fact exists, the court construes all facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572 (7th Cir. 2021).

## BACKGROUND

### I.    The Parties

RHPA employs and otherwise engages physicians and other health care professionals and staff members on behalf of Reid Health, a regional healthcare provider offering comprehensive inpatient and outpatient services in Eastern Indiana and Western Ohio. Dr.

Draghiciu, a medical doctor, began working for RHPA in May 2013 as a Pulmonary Critical Care/Intensivist Medicine physician in the Intensive Care Unit ("ICU") at Reid Health.

## II.    Dr. Draghiciu's Employment Agreements

Dr. Draghiciu's employment relationship with RHPA and Reid Health was governed by the following agreements:

### A.    The Professional Services Agreement

In November 2020, when Dr. Draghiciu was sixty-one years of age, RHPA and he entered into the Professional Services Agreement (the "Agreement") covering Dr. Draghiciu's continued employment as an inpatient Pulmonary Critical Care/Intensivist Medicine physician at Reid Health's ICU. Dr. Draghiciu agreed to provide a number of "professional services," including "[a]ct[ing] in a manner consistent with and supportive of Reid [Health's] and RHPA's interests," dkt. 63-2 at 32 (Section 1.5(l)), in exchange for which Dr. Draghiciu was paid an annual salary of $450,000. His work schedule required that he provide services on an alternating, weekly basis. During his on-duty weeks, Dr. Draghiciu worked ten-hour shifts and remained on standby for nighttime emergencies.

The Agreement expressly stated that, as a full-time RHPA physician, *id.* at 31 (Section 1.2), Dr. Draghiciu would "not be further compensated for medical director services performed during a scheduled shift." *Id.* (Section 1.3). Insofar as Dr. Draghiciu was tasked with certain medical director responsibilities, such services were to be provided (and compensated) "under a separate Medical Director Contract." *Id.*

Under the Agreement's for-cause termination provision, "[e]ither party [could] terminate th[e] Agreement for cause upon thirty (30) days prior written notice in the event the

other party defaults under or breaches a term of this Agreement including, but not limited to, those terms under Sections 1.4 and 1.5 and Exhibit A; provided further that compliance shall be determined at the sole discretion of RHPA." *Id.* at 37 (Section 4.2(c)).

### B.    The PRN Staffing Agreement

In November 2020, Dr. Draghiciu and RHPA also executed the PRN Staffing Agreement (the "PRN Agreement"), pursuant to which Dr. Draghiciu provided outpatient sleep study services on an as-needed basis. *See generally* dkt. 63-2 at 54–55. His primary duties in this context included reviewing sleep chart data for diagnostic and treatment purposes. Under the PRN Agreement, Dr. Draghiciu earned $61.63 for each "work relative value unit" ("wRVU") he provided, the total calculation and mechanics of which payments neither party has detailed further.

### C.    The Medical Director Agreement

In April 2022, Dr. Draghiciu and Reid Health executed the Medical Director Agreement (the "Medical Director Agreement"), pursuant to which Dr. Draghiciu was compensated on an hourly basis for his service as a medical director at Reid Health's Sleep Medicine centers in Richmond and Connersville, Indiana. (Dr. Draghiciu's responsibilities as medical director are not described to us, since neither party has explained what those duties entailed.)

## III.    Dr. Draghiciu's (Reported) Double Dipping

A central dispute in this litigation has arisen over Dr. Draghiciu's alleged "double dipping," which term the parties apply to describe Dr. Draghiciu's practice of performing (and billing for) sleep study and medical director services, pursuant to the PRN and the

Medical Director Agreements, respectively, while on-duty in his full-time ICU capacity, pursuant to the Agreement.

### A.    March 2022 Emails re: "Dr. Draghiciu Conversation"

In a March 14, 2022, email exchange between Director of Inpatient Physician Services Stacia Robertson ("Ms. Robertson") and Director of Inpatient Nursing Jared Dunlap ("Mr. Dunlap"), Ms. Robertson stated that she had "met with Dr. Draghiciu regarding the submission of medical director hours during his ICU shifts." Dkt. 63-2 at 16. Ms. Robertson wrote, "I discussed this with him last Friday . . . , and he again submitted more hours. When I talked to him today, [Monday, March 14th,] he said that if he is not paid, then he will automatically relinquish being CCU medical director." *Id.*

That same day, Mr. Dunlap responded to Ms. Robertson saying that he would "touch base with" Dr. Draghiciu and that Misti Foust-Cofield ("Ms. Foust-Cofield"), Reid Health's Vice President and Chief Nursing Officer, also planned "to reach out and have a 1:1 with him." *Id.* (Defendants do not disclose whether or when any subsequent conversations occurred, what was said, or who was involved.)

When asked during his deposition about communications concerning "the issue of medical director and sleep study work that was being performed during ICU shift time," Dr. Draghiciu stated, "The only discussions were strictly referring to medical directorships. At no time were [Ms. Robertson and Mr. Dunlap] referring to sleep studies because they were the one[s] that kept hourly tracking." Draghiciu Dep. 28:7–16, dkt. 63-1. According to Dr. Draghiciu, Ms. Robertson and Mr. Dunlap "would not talk to [him] about sleep study reading . . . because that was outside their scope of practice." *Id.* at 28:17–21. As for any

purported communications with Ms. Foust-Cofield around this time, Dr. Draghiciu testified that he "d[id] not recall talking to [her] specifically about doing or not doing sleep studies." *Id.* at 28:23–25.

### B.  October 5, 2022, Cease & Desist Meeting

On October 5, 2022, Dr. Draghiciu attended in-person a meeting with Ms. Foust-Cofield, with the Chair of the Network Operating Council Rohit Bawa, M.D. ("Dr. Bawa"), and with Defendants' Vice President and General Counsel Pamela Jones ("Ms. Jones"), during which meeting Dr. Draghiciu received a verbal warning regarding his improper billing practices, in violation of the Agreement. Dkt. 63-3 at 2–3.

On October 5, 2022, a cease-and-desist letter (printed on Reid Health letterhead) issued by Ms. Foust-Cofield reiterated the hospital's expectation that Dr. Draghiciu would refrain from "submitting hours for medical director payment" and "recording time spent reviewing sleep studies" during his ICU shift time. Dkt. 63-2 at 17. The cease-and-desist letter excerpted Dr. Draghiciu's contractual obligations under Sections 1.2, 1.3, and 1.5(l) of the Agreement, pursuant to which he had agreed to provide full-time physician services to the exclusion of any other medical director responsibilities and to serve with Reid Health's and RHPA's best interests in mind. *Id.* The cease-and-desist letter forewarned that "[a]ny additional reports regarding work performed during . . . scheduled ICU time may result in additional action being taken by RHPA." *Id.*

### C.  Dr. Draghiciu's Compliance Efforts

In an October 15, 2022, email to Dr. Draghiciu, Ms. Foust-Cofield stated her "understanding" that wRVU generation occurs "at the time the document is signed." Dkt. 63-

6 at 1. She further stated that, "if this is completed after your ICU hours[,] this should be perfect." *Id.* No party has disclosed Dr. Draghiciu's exact inquiry that prompted this reply, nor have we been able to discern the context for their interaction. However, Dr. Draghiciu, apparently in reliance on Ms. Foust-Cofield's email, "ensur[ed] that all [future] signatures occurred outside [his] designated ICU shift hours." Draghiciu Aff. ¶¶ 7–8, 11, dkt. 69-1.

### D.    2023 Audit

In the spring of 2023, an audit was conducted of the ICU's medical records, which revealed more than 400 entries recording that Dr. Draghiciu had performed sleep study reviews (pursuant to the PRN Agreement) while on shift at the ICU (pursuant to the Agreement). Foust-Cofield Decl. ¶¶ 15–17, dkt. 63-4. The audit reflected, in relevant part, the dates and times that Dr. Draghiciu performed and signed sleep study reviews, thereby generating wRVUs, while on duty at the ICU. *Id.* ¶ 18. For example, a log entry from April 8, 2023, revealed that Dr. Draghiciu worked "in" the ICU; that he "dictat[ed]" a sleep study at 7:32 a.m.; and that he signed the report at 10:05:28 p.m. *Id.* ¶ 19 (discussing the audit report, dkt. 63-7 at 5). According to Ms. Foust-Cofield, the 2023 audit results conclusively established that Dr. Draghiciu had continued to "double dip" by completing sleep study reviews during his ICU shifts. Foust-Cofield Decl. ¶ 19, dkt. 63-4.

### IV.    Dr. Draghiciu's Termination

Having determined that Dr. Draghiciu had performed "his PRN hourly duties (under the PRN Agreement) while on shift in the ICU (under the Professional Services Agreement)," Defendants decided to terminate Dr. Draghiciu's employment, pursuant to the for-cause termination provision in the Agreement. Dkt. 63 at 8. On May 31, 2023, Dr. Bawa

and former Vice President and Chief Medical Officer Dr. Vinay Bhooma ("Dr. Bhooma") met with Dr. Draghiciu (for approximately "five minutes") to notify him that his employment was being terminated, effective immediately. Draghiciu Dep. 32:2, dkt. 63-1. Dr. Draghiciu stated during his deposition that, after "Dr. Bhooma presented" the formal notice of termination letter, he "had a chance to read it." *Id.* at 32:2–3. Thereafter, Dr. Draghiciu "tr[ied] to clarify and . . . was referred back to the letter[,] and the meeting ended." *Id.* at 32:3–5.

On May 31, 2023, a notice of termination, printed on RHPA letterhead and signed by Craig Kinyon ("Mr. Kinyon"), whose signature block identifies him as the President and Chief Executive Officer of Reid Health, was issued. Dkt. 63-2 at 29. The notice stated, in relevant part, that Dr. Draghiciu had breached Sections 1.2, 1.3, and 1.5(l) of the Agreement by "continu[ing] to perform duties related to [the] PRN [A]greement while staffing the ICU under [his] fulltime shift requirements." *Id.* The notice further stated that the 2023 audit "detected 408 occurrences where dictation for Sleep Studies or Pulmonary tests for OP visits were either initiated or completed by [Dr. Draghiciu] while working during [his] normal intensivist role . . . ." *Id.* Defendants concluded that Dr. Draghiciu had violated Section 1.3's prohibition against "further compensation for medical director services[1] performed

---

[1] Defendants have not clarified precisely what Dr. Draghiciu's "medical director services" entailed, nor have they asserted that sleep study reviews were compensable as medical director hours under the Medical Director Agreement. Defendants have averred that Dr. Draghiciu's sleep study reviews and wRVU compensation were governed by the PRN Agreement. *See* dkt. 63 at 4. Thus, Mr. Kinyon's reference to "medical director services" as the basis for Dr. Draghiciu's termination is confusing to us, given that Mr. Kinyon also "[s]pecifically" (and exclusively) cited Dr. Draghiciu's "continu[ing] to perform duties *related to* [*his*] *PRN* [*A*]*greement*" (i.e., sleep study reviews) as the problematic conduct. Dkt. 63-2 at 29. Dr. Draghiciu, for his part, likewise offers no clarification. However, we note (but express no view as to the implications of) Section 1.4 of the Agreement,

during a scheduled shift." *Id.* Defendants identify Ms. Jones, Dr. Bawa, Dr. Bhooma, and Mr. Kinyon as persons who "were involved in the decision to terminate Plaintiff's employment." Dkt. 63-3 at 2–3.

Although Dr. Draghiciu's termination was made effective immediately, RHPA's payroll records reflect that he continued to receive installment payments from his base salary as well as his benefits, including health insurance and professional liability coverage, through June 30, 2023. Dkt. 63-2 at 4, 56–61.

## V.    EEOC Charge of Discrimination

In August 2023, Dr. Draghiciu filed a Charge of Discrimination (the "Charge") with the Equal Opportunity Employment Commission (the "EEOC"), alleging that his employer, Reid Health, had discriminated against him on the basis of age, in violation of the ADEA. He was at the time sixty-three years of age. According to the Charge, Reid Health's stated reason for terminating Dr. Draghiciu's employment was his breach of the Agreement. Dkt. 29-1 at 2.

## VI.    Procedural History

On November 27, 2023, Dr. Draghiciu filed this lawsuit against Reid Health and RHPA alleging claims of age discrimination and breach of contract. On May 20, 2024, the parties stipulated to the dismissal with prejudice of Dr. Draghiciu's breach-of-contract claim against Reid Health, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii).

---

which expressly stipulates that "the provision of pulmonary medicine services to RHPA *pursuant to a PRN agreement* is not a violation" of RHPA's prohibition against moonlighting. Dkt. 63-2 at 31 (emphasis added). Unfortunately, because neither party addresses any potential legal significance of these discrepancies, we do not address them further.

Dkt. 38, 41. On March 12, 2025, we denied Defendants' partial motion to dismiss, wherein they asserted that Dr. Draghiciu had failed to exhaust his administrative remedies, as is required to sustain an ADEA claim. Dkt. 76. On January 14, 2025, prior to our resolving the motion to dismiss, Defendants moved for summary judgment on all claims. Dkt. 62. That motion is now fully briefed and ripe for ruling.

## DISCUSSION

Defendants seek summary judgment on Dr. Draghiciu's age discrimination claim against both Reid Health and RHPA as well as his breach-of-contract claim against only RHPA. We address each in turn below.

## I.    ADEA Claim[2]

The ADEA prohibits employers from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In effect, "[t]he ADEA protects workers who are forty years and older from discrimination

---

[2] Defendants "incorporate[ ]" and "re-assert" their position, raised initially in their motion to dismiss, dkt. 27, that Dr. Draghiciu's ADEA claim fails as a matter of law based on his failure to name RHPA in his EEOC Charge. Dkt. 63 at 15 n.8. Although Defendants briefed their summary judgment motion without the benefit of our decision rejecting this assertion as grounds for dismissal, *see generally* dkt. 76, in raising the argument on summary judgment, Defendants cite no additional support, either factual or legal, that persuades us to revisit the issue. That said, we think the extensive overlap between RHPA's and Reid Health's operations and personnel, *see, e.g.*, dkt. 63-2 at 29 (notice of termination printed with RHPA letterhead and signed by Reid Health's President and CEO); dkt. 29-2 (Indiana Secretary of State's public records demonstrating that Reid Health and RHPA share the same address, registered agent, and president), coupled with RHPA's timely confirmation of receipt of Dr. Draghiciu's Charge, *see* dkt. 36-1 (November 20, 2023, letter from Defendants' counsel to the EEOC, stating that the "firm has been retained to represent *RHPA* in this matter") (emphasis added), renders Defendants' purely semantic argument a nonstarter. *See Trujillo v. Rockledge Furniture LLC*, 926 F.3d 395, 396–97, 400–01 (7th Cir. 2019) (reversing dismissal of ADEA claim where plaintiff made minor error in naming employer in EEOC charge).

based on age." *Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022) (citing *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020)).

"[P]laintiffs in ADEA cases [must] show evidence that could support a jury verdict that age was the but-for cause of the employment action at the summary judgment stage." *Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 604 (7th Cir. 2012). A plaintiff may utilize "two frameworks to show discrimination." *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023). "Under the holistic approach . . . , we look at the evidence in the aggregate to determine whether it allows an inference of prohibited discrimination." *Id.* Alternatively, "[u]nder the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff must first establish a prima facie case for discrimination," which task entails, "in part, that the plaintiff was meeting the employer's performance expectations." *Id.* (citing *Brooks*, 39 F.4th at 434). Thereafter, the employer must proffer a " 'legitimate, non-discriminatory reason' for the employment decision," at which point the plaintiff then must demonstrate that the employer's stated reason was pretext for discrimination. *Id.* (quoting *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 574 (7th Cir. 2021)).

Where, as here, the employer "raise[s] the employee's performance as the reason for the adverse employment decision, the court 'may skip the analysis of the *prima facie* case and proceed directly to the evaluation of pretext.' " *Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 271 (7th Cir. 2023) (quoting *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477–78 (7th Cir. 2010)). Accordingly, "we need not consider [Dr. Draghiciu's] prima facie case under *McDonnell Douglas* or conduct a separate analysis of the facts under the two frameworks." *Vichio*, 88 F.4th at 691. Rather, we will proceed directly to a

consideration of whether the record evidence supports the conclusion that Defendants' stated reason for Dr. Draghiciu's termination was pretext for age discrimination.

### A.    Defendants' Nonpretextual Reason for Dr. Draghiciu's Termination

"Pretext is a lie, specifically a phony reason for some action, not just faulty reasoning or mistaken judgment on the part of the employer." *Bragg*, 58 F.4th at 271 (cleaned up). "The plaintiff must demonstrate pretext by a preponderance of the evidence." *Brooks*, 39 F.4th at 435. "To meet this burden, [the plaintiff] 'must show that either (1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or (2) that an employer's explanation is not credible.' " *Bless*, 9 F.4th at 573 (quoting *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004)).

In evaluating an employer's stated reasons for termination, the pretext inquiry concerns only "the honesty of the employer's explanation, rather than its validity or reasonableness." *Crain v. McDonough*, 63 F.4th 585, 593 (7th Cir. 2023); *see also Hudson v. Wal-Mart Stores, Inc.*, 412 F.3d 781, 784 n.1 (7th Cir. 2005) (noting that, in the context of an employer's investigation into employee misconduct, the court's inquiry at the pretext stage is whether the employer "came to an honest conclusion about the situation based on the information uncovered by the investigation"). A dishonest explanation from an employer may, in and of itself, "support an inference that its real reason was unlawful." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 932 (7th Cir. 2020). To demonstrate pretext, the plaintiff "must identify . . . weaknesses, implausibilities, inconsistencies, or contradictions" in the employer's "stated reasons that would allow a reasonable person to conclude that the stated

reason was unworthy of credence." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 380 (7th Cir. 2020) (internal quotations and citations omitted).

Regarding the case at bar, Defendants describe their non-discriminatory reason for Dr. Draghiciu's termination as his continued noncompliance with prior directives that he refrain from his non-ICU responsibilities while on-duty in the ICU. Although Dr. Draghiciu disagrees with Defendants' characterization of his purported "double dipping," he has not controverted key allegations demonstrating that Defendants—or, rather, those involved in the termination decision—sincerely and consistently regarded his performance and billing practices as violative of the Agreement. Those unrefuted facts include that, in March 2022, Dr. Draghiciu had been counseled by Ms. Robertson against submitting medical director hours during his ICU shifts; that, in October 2022, Dr. Draghiciu was formally admonished in person and through a cease-and-desist letter not to perform and bill for sleep studies and medical director hours during his ICU shifts; and that, based on the 2023 audit, further evidence corroborated Defendants' conclusions regarding Dr. Draghiciu's continued non-compliance with their directives to him. As reflected in the formal notice of termination, Mr. Kinyon expressly relied on the 2023 audit as evidence substantiating his conclusion that Dr. Draghiciu had improperly conducted sleep reviews during his ICU shifts. Dkt. 63-2 at 29.

## B.    Dr. Draghiciu's Evidence of Pretext

Dr. Draghiciu asserts several factors as evidence of pretext. As detailed below, however, none is availing.

13

1.    <u>Shifting Interpretation of Company Policy</u>

Dr. Draghiciu contends that Defendants' justification for his termination is pretextual because it relies on an interpretation of company policy that contradicts the explicit billing instructions he received from Ms. Foust-Cofield, a senior official, who stated in her October 15, 2022, email that wRVU generation occurs "at the time the document is signed. So if [wRVU generation] is completed after . . . ICU hours[,] this should be perfect." Dkt. 63-6 at 1. (Although Ms. Foust-Cofield's October 15, 2022, email has been submitted to the record, Dr. Draghiciu's original query, and thus the context of Ms. Foust-Cofield's response, has not been disclosed.)[3] According to Dr. Draghiciu, he complied with these instructions by signing off on sleep studies after completing his ICU shifts, "yet Defendants now claim his termination was justified based on a conflicting interpretation of company policy." Dkt. 70 at 13.

Dr. Draghiciu's theory is, in our view, both unsubstantiated and underdeveloped. Insofar as Dr. Draghiciu reasonably interpreted Ms. Foust-Cofield's email as sanctioning post-ICU sleep study submissions—an interpretation that Defendants dispute, dkt. 73 at 4–5—Dr. Draghiciu adduces no evidence that Ms. Jones, Dr. Bawa, Dr. Bhooma, and/or Mr. Kinyon—i.e., the only identified decisionmakers, dkt. 63-3 at 2–3—were aware of or otherwise condoned such guidance. Similarly, there is no evidence indicating that Ms. Foust-

---

[3] With regard to Dr. Draghiciu's request for guidance from Ms. Foust-Cofield, Dr. Draghiciu cites to a portion of his own deposition testimony that has not been included in the excerpts submitted to the record before us. Dkt. 70 at 5 (quoting Draghiciu Dep. "at 26, lines 15–20," dkt. 63-1). *But see* Draghiciu Dep. 25–27, dkt. 63-1 (page 26 of the deposition transcript omitted). To the extent that a party opposing summary judgment relies on evidence "that is not already in the record," that party bears the responsibility to "file and serve" such evidence. S.D. Ind. L.R. 56-1(b).

Cofield herself participated in the decision to terminate Dr. Draghiciu or exerted any influence over those that did. *See Sinha v. Bradley Univ.*, 995 F.3d 568, 573–74 (7th Cir. 2021) (explaining cat's paw theory of liability, which requires "a showing of both discriminatory animus *and* proximate causation") (emphasis in original). Based on the facts adduced here, no reasonable jury could find that Ms. Foust-Cofield's October 15, 2022, email demonstrates that Defendants shifted their interpretation of company policy, never mind that they disbelieved their stated reason for Dr. Draghiciu's termination.

2.    <u>Similarly Situated Comparators</u>

To bolster his theory that Defendants inconsistently enforced their double dipping policy, Dr. Draghiciu identifies two "substantially younger" doctors who allegedly committed the same infraction as he: Georges Debal, M.D. ("Dr. Debal") and Steve Osmon, M.D. ("Dr. Osmon").[4] Dkt. 70 at 14. According to Dr. Draghiciu, Dr. Debal provided "locum coverage[5] . . . during the COVID pandemic" and thereafter "was asked to join the locum pool before [Dr. Draghiciu's] departure." Draghiciu Dep. 36:22–37:4, dkt. 63-1. Dr. Osmon similarly performed "locum work and [was] asked to increase his amount of work prior to [Dr. Draghiciu's] departure." *Id.* at 37:5–8. Although Dr. Draghiciu "d[idn't] know

---

[4] In his deposition testimony, Dr. Draghiciu identified a third (potential) comparator, "Dr. Vacca," "a new partner in the group . . . who was in somewhat of a similar arrangement in the beginning also working in [the] ICU and pulmonary." Draghiciu Dep. 34:22–24, dkt. 63-1. However, because Dr. Vacca's age has not been revealed and because Dr. Draghiciu's responsive brief makes no mention of Dr. Vacca, *see* dkt. 70 at 14–15, we do not evaluate whether evidence of Dr. Vacca's treatment by Defendants supports an inference of pretext.

[5] In Dr. Draghiciu's words, "locum providers" are "physician[s] . . . that have no permanent contractual agreement with their employer. They provide coverage for a specific time when asked." Draghiciu Dep. 38:6–9, dkt. 63-1.

ages specifically," he maintains that Drs. Debal and Osmon are "much younger." *Id.* at 36:22, 37:8–9.

" '[C]omparator evidence and selective enforcement of an employer's rules' are relevant to a pretext analysis." *Napier v. Orchard Sch. Found.*, No. 23-1659, 2025 WL 1419918, at \*7 (7th Cir. May 16, 2025) (quoting *Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018)). "The similarly-situated [inquiry] calls for a 'flexible, common-sense' examination of all relevant factors" in order to gauge whether there are "sufficient commonalities on the key variables between the plaintiff and the would-be comparator" such that a jury could reasonably infer discrimination. *Coleman v. Donahoe*, 667 F.3d 835, 846, 841 (7th Cir. 2012) (quoting *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007)). The purpose behind "the comparison analysis is to eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus." *Formella v. Brennan*, 817 F.3d 503, 512 (7th Cir. 2016) (cleaned up). "Similarly situated employees must be directly comparable to the plaintiff in all material respects." *Napier*, 2025 WL 1419918, at \*7 (internal quotation and citation omitted). "In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman*, 667 F.3d at 847 (internal quotation and citation omitted).

Here, Dr. Drachiciu has not mustered sufficient evidence to establish that either Dr. Debal or Dr. Osmon qualifies as a similarly-situated comparator. Although Dr. Draghiciu

maintains, and Defendants do not contest, that Drs. Debal and Osmon are "much younger," Draghiciu Dep. 36:22, 37:8–9, dkt. 63-1, he identifies no material similarities beyond their shared specialty in pulmonary critical care. Nor does Dr. Draghiciu point to any evidence that Drs. Debal and/or Osmon dealt with the same supervisor(s), or that the same performance standards applied to them. *See Coleman*, 667 F.3d at 847. In truth, Dr. Draghiciu's own deposition testimony enhances the dissimilarities between him and Drs. Debal and Osmon. For example, prior to and at the time of Dr. Draghiciu's termination, RHPA employed no others whose work was governed by two (or more) separate employment agreements. *See* Draghiciu Dep. 40:1–9, dkt. 63-1. Moreover, Dr. Draghiciu's averment that Drs. Debal and Osmon "engaged in similar activity," dkt. 70 at 6—that is, "[p]erform[ed] . . . ICU and outpatient work in the same timeframe," Draghiciu Dep. 35:23–24, dkt. 63-1— ignores a key undisputed fact: by virtue of their status as locum providers, neither Dr. Debal nor Dr. Osmon was an RHPA employee. *Id.* at 38:10–17. In short, the lack of evidence illuminating any material similarities between Dr. Draghiciu and his purported comparators, coupled with unrefuted evidence that neither Dr. Debal nor Dr. Osmon was an RHPA employee (never mind one such employee with multiple employment contracts), fails to establish that a reasonable jury could infer pretext from Defendants' alleged "selective enforcement" of the double dipping prohibition.

Relatedly, Dr. Draghiciu attempts to buttress his pretext argument by pointing to Dr. Debal, his "much younger" replacement, who "had his sleep medicine work reassigned to

two other doctors, allowing him to work only in pulmonary critical care." Dkt. 70 at 6.[6] Replacement by a similarly situated, younger employee certainly can, as Dr. Draghiciu contends, serve as probative evidence of age discrimination. *See Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 675 (7th Cir. 2003). Here, however, Dr. Draghiciu replacement theory is unaccompanied by any showing that he and Dr. Debal were similarly situated in terms of being subject to a comparable contractual arrangement with RHPA, similar billing (or, rather, "double dipping") behaviors, or the like. *Pitasi v. Gartner Grp., Inc.*, 184 F.3d 709, 717 (7th Cir. 1999) (affirming entry of summary judgment against ADEA plaintiff who "ha[d] not offered any evidence to show that the other analysts who were retained were 'similarly situated' to him") (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1398 (7th Cir. 1997) (affirming entry of summary judgment against Title VII plaintiff and explaining that the employees "who picked up pieces of [the plaintiff's] job" after his termination "could not be thought similarly situated per se, that is, without evidence of similarity, of which [the plaintiff] presented none")); *see Blakely v. Brach & Brock Confections, Inc.*, 59 F. App'x 844, 847 (7th Cir. 2003) (affirming entry of summary judgment against Title VII plaintiff who failed to adduce evidence that employees outside his protected class "remained employed despite similarly substandard work performance").

---

[6] As evidentiary support, Dr. Draghiciu cites his own affidavit, wherein he stated, in relevant part, that Dr. Debal "only practices pulmonary critical care, not sleep medicine. The sleep work was reassigned to two other doctors after my departure." Draghiciu Aff. ¶ 13, dkt. 69-1. Although this portion of Dr. Draghiciu's affidavit lacks clarity as to *whose* "sleep work was reassigned" as well as *to whom* such work was reallocated, we read this evidence in the light most favorable to the nonmoving party and thus accept, for present purposes, Dr. Draghiciu's assertion that Dr. Debal's sleep study work was reassigned. *But see* dkt. 73 at 6–7 (Defendants construing Paragraph 13 as proof that Dr. Debal is not similarly situated because he does "not work in sleep medicine").

At bottom, the fact that Dr. Debal (eventually) replaced Dr. Draghiciu accomplishes little in terms of moving the needle towards an inference of discriminatory pretext.

3.    <u>Miscellaneous Evidence of Pretext</u>

Dr. Draghiciu's remaining arguments about pretext are factually unsupported and thus unavailing. For example, his assertion that Defendants "deviat[ed] from standard employment practices" by "fail[ing] to apply any progressive discipline," dkt. 70 at 16, does not persuade us that Defendants' stated reason for his termination was pretextual. Although an employer's "selective enforcement or investigation of a disciplinary policy can . . . show pretext," *Baker v. Macon Resources, Inc.*, 750 F.3d 674, 677 (7th Cir. 2014), Dr. Draghiciu fails to specify any purported "standard employment practices" from which Defendants allegedly diverged. In any event, the unrefuted record evidence belies Dr. Draghiciu's contention regarding a lack of "progressive discipline," given that, prior to his termination, Dr. Draghiciu had been counseled about his billing practices on at least two occasions: once in March 2022 and again in October 2022.

Dr. Draghiciu also argues that Defendants' reliance on the 2023 audit demonstrates pretext because he "was never presented with or allowed to challenge the audit findings before termination." Dkt. 70 at 16. This bare assertion, unaccompanied by any supporting legal authority, fails to establish that Dr. Draghiciu's (lack of) awareness about the 2023 audit has any bearing whatsoever on the validity and/or Defendants' interpretation of the audit results. Moreover, the law is well-established that our task at the stage of the pretext analysis is to review "the honesty of the employer's explanation, rather than its validity or reasonableness." *Crain*, 63 F.4th at 593 (internal quotation and citation omitted). Thus,

"[e]rroneous (but believed) reasons for terminating an employee are not tantamount to pre-textual reasons." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 407 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008).

Putting "the evidence in 'a single pile' and evaluat[ing] it 'as a whole,' " we are unable to conclude that a reasonable jury could find that Dr. Draghiciu's age led to his termination. *Chatman v. Bd. of Educ. of City of Chicago*, 5 F.4th 738, 748 (7th Cir. 2021) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016)). Defendants' expectations concerning Dr. Draghiciu's (reported) "double dipping" were articulated and communicated consistently, as reflected by the October 2022 cease-and-desist letter as well as the May 2023 notice of termination. Dr. Draghiciu has mustered no record evidence to suggest that Defendants' reliance on the 2023 audit results "was a lie or subterfuge for discrimination." *Id.* Dr. Draghiciu's age discrimination claim consequently fails for lack of proof, *id.*, and Defendants are entitled to summary judgment accordingly.

## II.    Breach of Contract

Typically, "when . . . the federal claim drops out before trial," as has happened here, "the federal court should relinquish jurisdiction over the supplemental [state-law] claim." *Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997). One exception to the "rule of thumb" occurs "when it is absolutely clear how the pendent claim[ ] can be decided." *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (internal quotation and citation omitted). Defendants here ask that we undertake and resolve Dr. Draghiciu's contract claim on the grounds that its outcome is "absolutely clear." Dr. Draghiciu has raised no

objections to our retaining jurisdiction. We proceed to the merits of the breach of contract claim accordingly.

The essential elements of a breach of contract claim are "the existence of a contract, the defendant's breach of that contract, and damages resulting from the breach." *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012). There is no dispute raised here over the fact that the Agreement constituted a valid employment contract between Dr. Draghiciu and RHPA; thus, we turn to the elements of breach and damages below.

## A.    Breach

"Under Indiana law, courts give  unambiguous contract terms their plain meaning." *Villas at Winding Ridge v. State Farm Fire & Cas. Co.*, 942 F.3d 824, 830 (7th Cir. 2019). Our task therefore is straightforward: "we will not construe an unambiguous contract or look to extrinsic evidence, but will merely apply the contractual provisions." *Id.* (internal quotation and citation omitted).

Here, Dr. Draghiciu alleges that RHPA breached Section 4.2(c) of the Agreement, which provides, in pertinent part, as follows:

> <u>Termination for Cause.</u> Either party may terminate this Agreement for cause upon thirty (30) days prior written notice in the event the other party defaults under or breaches a term of this Agreement . . . , provided further that compliance shall be determined at the sole discretion of RHPA. If so directed by RHPA, Physician shall neither perform services pursuant to this Agreement nor enter the Practice Site during such notice period so long as RHPA continues to pay Physician all amounts owing . . . .

Dkt. 63-2 at 37.

Dr. Draghiciu maintains that RHPA breached Section 4.2(c) in two ways: first, by terminating his employment effective immediately, in violation of the required "thirty (30)

days prior written notice"; and, second, by exercising its "sole discretion" to determine Dr. Draghiciu's compliance in bad faith. *Id.*

It is clear that RHPA failed to abide by the thirty-day notice provision, as the May 31, 2023, notice of termination states that Dr. Draghiciu's "last day of employment with RHPA [wa]s [also] May 31, 2023." Dkt. 63-2 at 29. Indeed, RHPA has itself conceded that "Plaintiff wasn't provided with thirty days' advance notice . . ." Dkt. 73 at 11. However, Dr. Draghiciu's latter contention—that RHPA acted in bad faith—lacks the factual and legal support necessary to survive summary judgment. Dr. Draghiciu asserts, without citation to any record evidence, that RHPA acted in bad faith by not affording him "an opportunity to respond" and by its "inconsistent and contradictory application of [its] own policies." Dkt. 70 at 18, 19. Even if true, Dr. Draghiciu has failed to cite any contractual provision entitling him to "an opportunity to respond" as well as to elaborate the factual and legal bases for his contention that RHPA interpreted and applied company policies in bad faith. As such, Dr. Draghiciu's bad faith theory of recovery necessarily fails as a matter of law, and RHPA is entitled to summary judgment accordingly.

### B.    Damages

Our final inquiry is whether Dr. Draghiciu can establish any entitlement to damages based on RHPA's conceded failure to comply with Section 4.2(c)'s thirty-day notice provision. A plaintiff must "prove that the alleged breach of contract was a cause in fact of his loss, which requires a showing that the breach was a 'substantial factor' in bringing about the plaintiff's damages." *Shepard v. State Auto. Mut. Ins. Co.*, 463 F.3d 742, 744 (7th Cir. 2006) (citation omitted). "Although causation is normally a question of fact for the jury,

summary judgment is appropriate when the undisputed facts establish that a plaintiff," who ultimately bears the burden of pleading and proving damages, "cannot show the requisite causation as a matter of law." *Id.* at 745 (internal citations omitted).

A "party injured by a breach of contract may recover the benefit of its bargain but is limited in its recovery to the loss actually suffered." *L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031, 1043 (Ind. Ct. App. 2012). "[D]amages cannot be based on mere speculation and conjecture. Rather, a plaintiff must have adequate evidence to allow a jury to determine with sufficient certainty that damages in fact occurred, and, if so, to quantify such damages with some degree of precision." *Shepard*, 463 F.3d at 745.

Although RHPA concedes that it failed to abide by the thirty-day notice provision, it maintains that Dr. Draghiciu cannot prove any entitlement to damages because he received compensation and benefits through June 30, 2023 (or thirty days following his May 31, 2023, termination), as was affirmatively established by the payroll records. Dkt. 63-2 at 4, 56–61.[7] Dr. Draghiciu argues that he was entitled to 120, rather than thirty, days' pre-termination notice, relying specifically on the "termination *without* cause" provision under Section 4.2(b) of the Agreement. Dkt. 70 at 18. Given the undisputed fact that Dr. Draghiciu was terminated *with* cause, pursuant to Section 4.2(c), *see* dkt. 63-2 at 29, we fail to see

---

[7] In his summary judgment brief, Dr. Draghiciu challenges RHPA's reliance on his untimely responses to Defendants' request for admission, dkt. 70 at 2–3; dkt. 73 at 8–10, which matters are therefore deemed "admitted" and "conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b). Because RHPA has substantiated its factual assertions with additional, unchallenged evidence—namely, the payroll records—we need not (and thus do not) resolve the parties' evidentiary disagreement.

any contractual basis for his claimed entitlement to 120 days of advance notice under Section 4.2(b), never mind how Section 4.2(b) establishes a basis for damages.

Dr. Draghiciu's final argument for damages is that RHPA's breach resulted in "significant harm to his reputation and future employment prospects." Dkt. 70 at 19. Unfortunately, however, Dr. Draghiciu has neither adduced any evidence of nor established how RHPA's failure to provide proper notice *caused* such reputational harm. "Indiana law requires a sufficient degree of certainty to support an award of damages," and "when a plaintiff cannot establish damages with sufficient certainty to avoid speculation or conjecture by the jury, the defendant is entitled to judgment as a matter of law." *Shepard*, 463 F.3d at 748. Thus, Dr. Draghiciu's conclusory allegations of reputational harm and hindered employment prospects do not, by themselves, suffice to survive RHPA's summary judgment motion.[8]

## CONCLUSION

For the reasons detailed above, Defendants Motion for Summary Judgment is **GRANTED**. Dkt. 62. Final judgment shall enter accordingly.

IT IS SO ORDERED.

Date:   6/6/2025

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

[8] One final "complication (which neither party mentions) arises from the fact that Indiana recognizes nominal damages in breach of contract actions." *Shepard*, 463 F.3d at 748. Because Dr. Draghiciu has failed to establish any causal link between RHPA's breach and the alleged harm, summary judgment remains appropriate. *See id.*

Distribution:

Timothy A. Dowers
John H. Haskin & Associates
tdowers@jhaskinlaw.com

John H. Haskin
JOHN H. HASKIN & ASSOCIATES, LLC
jhaskin@jhaskinlaw.com

Elizabeth Sawyer
Hall Render
lsawyer@hallrender.com

Dana Eugene Stutzman
Hall, Render, Killian, Heath & Lyman, P.C.
dstutzman@hallrender.com